**In re Jim O. RHEAD and Karin Rhead, Debtors.**

**In re FIVE FLAGS HOTEL CORPORATION, Debtor.**

**In re PARAGON HOTEL CORPORATION, Debtor.**

**In re PAGE HOLIDAY INN AS-SOCIATES, an Arizona limited partnership, Debtor.**

Bankruptcy Nos. 93–10596–PHX–CGC, 93–12465–PHX–CGC, 94–01856–PHX–CGC and 94–01857–PHX–CGC.

United States Bankruptcy Court, D. Arizona.

Feb. 8, 1995.

John R. Clemency, Scott B. Cohen, Phoenix, AZ, for debtors Jim O. and Karin Rhead.

Michael G. Helms, Phoenix, AZ, for SKW Real Estate Ltd. Partnership.

John D. Torres, Patrick R. Barrowclough, Phoenix, AZ, for Resolution Trust Corp.

## ORDER RE: PLAN CONFIRMATION

CHARLES G. CASE, II, Bankruptcy Judge.

### I. INTRODUCTION

The Debtors, Jim O. Rhead and Karin Rhead (the "Rheads" or the "Debtors"), filed their initial Plan of Reorganization on June 3, 1994. Following approval of the Disclosure Statement, the Plan of Reorganization was put out for vote and an initial confirmation hearing was set for July 12, 1994. The date for filing ballots and objections was set for July 5, 1994.

A few days before the confirmation hearing, on July 8, 1994, the Debtors filed an Amended Plan of Reorganization.[1] At the July 12, 1994 hearing, numerous objections to the Plan were raised, primarily by creditors SKW Real Estate Limited Partnership ("SKW"), Holiday Inns ("Holiday Inns") and

1. As discussed in more detail later, the primary change in the Amended Plan related to the proposed treatment of the property tax claim of Maricopa County, Arizona.

2. The issues set for hearing turn primarily on legal rather than factual determinations. The other objections raised (e.g., whether the plan is feasible, provides fair and equitable treatment to the objecting creditors, satisfies the best interests

the Resolution Trust Corporation as Receiver for Western Savings & Loan Association ("RTC"). The confirmation hearing was thereafter continued until August 11, 1994.

At the August 11, 1994 hearing, Debtors' counsel urged that consideration of the Rheads' Plan of Reorganization be deferred until confirmation proceedings in three related business cases were concluded. Those cases are: Five Flags Hotel Corporation (Case No. 93–12465–PHX–CGC) ("Five Flags"), Paragon Hotel Corporation (Case No. 94–01856–PHX–CGC) ("Paragon") and Page Holiday Inn Associates (Case No. 94–01857–PHX–CGC) ("Page").

Debtors' request for deferral was resisted by the objectors.

In an Order dated August 11, 1994, the Court denied the Rheads' request and set a continued hearing for September 26, 1994 on two discreet issues relating to confirmation.[2] These are:

(1) Whether SKW holds a claim against the Rheads based upon the Rheads' guarantee of Paragon debt now secured by property held by Page and Five Flags; and whether such claim is subject to estimation under Bankruptcy Code § 502(c);

(2) Whether the balloting on the Plan produced an accepting impaired class; and whether any ballots should be designated pursuant to Bankruptcy Code § 1126(e) and not counted by reason of improper solicitation; and

In addition to memoranda and motions previously filed, the parties submitted additional briefs and the Court heard extensive arguments. These two matters are now ripe for decision.[3]

of creditors test and is proposed in good faith) are more factually intensive and therefore consideration of them was deferred. A third issue was submitted but discussion of it is omitted from this Order.

3. This order shall constitute findings of fact and conclusions of law as required by Rules of Bankruptcy Procedure 7052 and 9014.

## II. DISCUSSION

### 1. *The SKW Claim.*

#### A. *Estimation of the SKW Claim.*

 The Rheads seek "estimation" of SKW's asserted claim of over $1.9 million. Estimation is allowed where a debt is "contingent or unliquidated." 11 U.S.C. § 502(c). If the debt does not fit that definition, estimation is inappropriate. *See In re Continental Airlines,* 981 F.2d 1450 (5th Cir.1993). Therefore, the first issue is whether estimation is available at all to the Rheads.

 SKW's claim arises out of a guarantee executed by the Rheads of a debt owed by Paragon[4] to SKW's predecessor. SKW is now the beneficiary of that guarantee. By its terms, the guarantee is unconditional. Upon default of the principal on the underlying debt, liability on the guarantee becomes fixed. Here, the underlying debt was in default well before the bankruptcies. As a result, liability on the guarantee is no longer contingent because all predicates to enforcement have occurred. *See In re Waters,* 8 B.R. 163 (Bankr.N.D.Ga.1981); *In re Wilson,* 9 B.R. 723 (E.D.N.Y.1981) ("As a guarantor of payment, liability attached to the debtor immediately upon the default of the principal obligor."). In short, but for the bankruptcy, SKW could seek a judgment against the Rheads for the full amount guaranteed, without the occurrence of any further event.

 Nevertheless, Rheads argue that the guarantee claim is either contingent or unliquidated because the principal's liability is secured by real property, the agreed value of which is greater than the amount of the debt. Further, Rheads assert that the Plans in each of the cases where the collateral presently resides provide for "full payment" of SKW's claims. Therefore, Rheads argue, the SKW claim should be estimated at "zero" since that creditor will receive payment in full from another source.

Admittedly, it is possible, perhaps even probable, that the obligation due under the guarantee will be paid from another source. However, that fact alone does not make the debt either unliquidated nor contingent. The Ninth Circuit, in *In re Fostvedt,* 823 F.2d 305 (9th Cir.1987), made clear that a Chapter 13 guarantor was liable for the full amount of a guaranteed debt "regardless of the possibility that his co-obligors would eventually pay some or all of the debt." Further, since the triggering event for liability purposes (the default of the principal obligor) had taken place, the *Fostvedt* court found that the debt was not contingent.

 In this case, however, other factors make this debt unliquidated to some degree. A claim is liquidated "when ... the amount due may be ascertained by computation or reference to the contract out of which the claim arises." *In re Flaherty,* 10 B.R. 118, 120 (Bankr.N.D.Ill.1981). Rheads correctly argue that this debt is not liquidated since they have filed objections, challenging certain aspects of the Proof of Claim filed by SKW.[5] For example, Debtors object to the addition of default interest and certain other costs and charges. Further, the Debtors claim that the "revolving" portion of the debt[6] has been paid. SKW disputes all these allegations.

While the Court rejects estimation at "zero," estimation in some amount is needed, given the Debtors' pending claim objections. Because of these unresolved objections, SKW technically does not have an allowed claim. *See* 11 U.S.C. § 502(a). Only holders of allowed claims may vote on a plan. 11 U.S.C. § 1126(a). Strict adherence to this rule would disenfranchise SKW from voting; as candidly pointed out by Rheads' counsel at the hearing, such last minute maneuvering is disfavored. Estimation is appropriate where the "fixing or liquidation" of the claim "would unduly delay the administration of the case." That standard is met since the Court must now determine whether the class of unse-

---

4. Rheads are primary shareholders of Paragon.

5. SKW asserts that these objections are not timely. The Court has reviewed the Minutes of previous hearings and finds no clear direction that a firm, absolute bar date was established for the

filing of objections to claims. Therefore, SKW's timeliness objection is overruled.

6. The "revolving" portion of the debt is approximately $500,000.

cured creditors has accepted the Plan and must in the near future determine whether the Plan meets other Section 1129(a) and (b) confirmation requirements. Therefore, the Court will estimate SKW's claim at $1 million[7], representing that portion of the SKW claim which is unquestioned.[8]

B. *Allowance of the SKW Claim.*

■ The real thrust of the Debtors' argument is to seek disallowance of the SKW claim, or more precisely, allowance at "zero." For this purpose, the Debtors correctly argue that state law should control. Section 502(b)(1) provides the basic rule that the Court shall allow a claim except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under ... applicable law...." The seminal case of *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), established that applicable law for these purposes is governing state law. Therefore, an examination of SKW's rights under Arizona law is necessary.[9]

■ The resolution of this issue turns upon an interpretation of A.R.S. §§ 12–1566 and 33–814.[10] These statutes provide protection to debtors, whether original obligors or guarantors, where the debt is secured by real property. Under the Arizona statutory scheme, a deed of trust may be foreclosed nonjudicially through an expedited procedure known as a "trustee's sale." The trustee's sale mechanism was adopted in 1971 to provide an alternative to the more cumbersome process of judicial foreclosure. Under the trustee's sale procedure, a trustee holds legal title to real property given as security for a debt and may invoke a "power of sale" in the event of a default. A.R.S. § 33–807(A). A trustee's sale may not occur earlier than 90 days following recordation of the Notice of Trustee's Sale. A.R.S. § 33–807(C). Up until the day before the sale, the borrower or any junior lienholder may reinstate the defaulted obligation by paying any past due amounts, together with certain statutory fees. A.R.S. § 33–813. This right exists notwithstanding any contractually based acceleration of the note. On the date set, the sale is conducted by the trustee, typically a title company or a lawyer, at which time the lienholder may credit bid and third parties may purchase for cash. At the completion of the trustee's sale, the purchaser is given a trustee's deed and the debtor's rights in the property are extinguished, without right of redemption.

7. Rough estimation at $1 million is sufficient since it is immaterial whether the claim is $1 million or $1.9 million or some number in between. In any event, the amount of the claim is so substantial that it dwarfs all other unsecured claims, both for purposes of voting and other confirmation tests.

8. The precise amount of the claim will be determined in the ordinary course of the claims objection process.

9. SKW argues that the resolution of this issue is controlled by the Supreme Court's decision in *Reconstruction Finance Corp. v. S.L.W.R. Co.,* 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946). In that case, the Supreme Court stated "the rule is well settled in bankruptcy proceedings that a creditor secured by the property of others need not deduct the value of the collateral or its proceeds improving its debt." *Id.,* 328 U.S. at 529, 66 S.Ct. at 1300. Likewise, SKW argues that *In re Gessin,* 668 F.2d 1105 (9th Cir.1982), is also controlling: "It has long been established that a creditor is entitled to pursue his claims against others liable on the same debt to the full extent of the amount owed on that debt." *Id.,* 668 F.2d at 1107. SKW is incorrect. In neither case was there an issue of the impact of a particular aspect of state law upon the creditor's rights against the guarantor. While the rule stated in these cases may be applicable in a general sense, it is not applicable where a specific statute of state law controls the creditor's rights. *See Butner v. United States, supra.*

10. SKW argues that the Rheads waived any benefits of A.R.S. § 12–1566 or § 33–814 in the guarantee itself. The waiver language in the guarantee is silent on A.R.S. § 12–1566; this is not surprising since the statute did not exist at the time the guarantee was executed. Under these circumstances, it cannot be said that the waiver language constitutes a "voluntary relinquishment of a known right." *State v. Davis,* 108 Ariz. 335, 337, 498 P.2d 202, 204 (1972). While the Arizona Court of Appeals in *First Interstate Bank, N.A. v. Tatum & Bell Ctr. Assoc.,* 170 Ariz. 99, 821 P.2d 1384 (Ct.App.1991) held that guarantors were entitled to fair market value protection under previous versions of A.R.S. § 33–814, this was a matter of controversy which was not clarified until the *Tatum and Bell* decision. Therefore, the protection afforded by these related statutes could not be called a "known right" and consequently the purported waiver is ineffective.

While the secured creditor under this procedure is entitled to credit bid its entire claim, it is not required to do so. The spectre of a secured creditor seeking to preserve an excessive deficiency by making a "low ball" credit bid was the impetus for the inclusion of the so-called "fair market value credit" in the original 1971 statute. The law[11] provides that a creditor's entitlement to a deficiency is limited to the difference between the amount of the debt and the greater of the amount of the successful bid at the trustee's sale and the fair market value of the property[12]. In this way, the debtor receives the benefit of at least the fair market value of the property, regardless of the amount bid at the sale.

A.R.S. § 33–814(C) was amended in 1990 to make clear that a *guarantor* of a debt secured by real property was entitled to the same credit.[13] A.R.S. § 12–1566 was added at the same time as a companion statute to extend the same protection to execution sales and to provide a broader explanation of the extent of the "fair market value credit" and its application to guarantors. To that end, Section 12–1566(E) provides, in part:

A guarantor of a debt or any other person directly, indirectly or contingently liable for the debt who is not a judgment debtor in an action for foreclosure of a mortgage or a deed of trust or an action for deficiency judgment shall receive the same *credit* as the judgment debtor receives pursuant to this section. . . .

[emphasis supplied].

Rheads argue that this statute requires that an immediate "credit" be given against their guarantee liability for the full value of the real property that secures the principal obligation of Paragon.[14] Rheads claim that since the fair market value of the collateral substantially exceeds any conceivable claim that SKW may have against any of the Debtors, A.R.S. § 12–1566 mandates that the value of the guarantee claim in their bankruptcy should be set at zero.

In further support of this position, Rheads argue that allowing SKW to assert its claim both against the principal obligor and against the guarantors would result in a windfall to SKW and would allow SKW to be paid "twice" for the same debt. Indisputably, SKW is entitled to only one satisfaction of its debt. *See Resolution Trust Corp. v. Berman Indus.*, 271 N.J.Super. 56, 637 A.2d 1297, 1302 (1993) (Creditor may recover no more than the amount of its loss).

Rheads are incorrect that allowing SKW to pursue its noncontingent claims in each of the bankruptcies would either be contrary to the terms or policies of these Arizona statutes or result in double payment to SKW. These points will be addressed in order.

On the first point, A.R.S. § 12–1566(E) provides that:

[t]he obligation of a guarantor may be enforced without regard to this section in accordance with the terms and conditions of the contract between the lender and the guarantor in an action independent of any other action or judgment.

Likewise, A.R.S. § 12–1566(G) provides that:

[t]his section shall not abate, suspend or bar any action of the holder of the judgment to realize upon or satisfy the judgment from personal property of a judgment debtor or guarantor or any other person directly, indirectly or contingently liable for the debt.

Finally, A.R.S. § 33–814(C) provides that:

[t]he obligation of a person who is not a trustor to pay, satisfy or purchase all or a part of the balance due on a contract secured by a deed of trust may be enforced, if the person has so agreed, in an action regardless of whether a trustee's sale is

---

11. A.R.S. § 33–814(C).

12. The statute defines "fair market value," contains a ninety-day limitation period for bringing a deficiency action and sets forth the procedures for a court determination of this amount. A.R.S. § 33–814(A).

13. As noted earlier, the Arizona Court of Appeals held in 1991 that the prior version similarly protected guarantors, notwithstanding the lack of explicit statutory language.

14. All parties agree the fair market values of the two hotels that secure the underlying debt are, in the aggregate, greater than the debt itself.

held.[15] *If, however, a trustee's sale is held, the liability of a person who is not a trustor for the deficiency is determined pursuant to Subsection A of this section and any judgment for the deficiency against the person shall be reduced in accordance with Subsection A of this section* [i.e., the fair market value credit shall apply]. [emphasis supplied]

 Each of these related sections makes clear that a creditor holding a guarantee has the option to pursue its remedies in the manner and order it deems appropriate. The "fair market value credit" comes into play if, and only if, the creditor actually receives the property through foreclosure or trustee's sale.

Notwithstanding this statutory language, Rheads argue that they are entitled to an "up front" credit for the fair market value of the underlying security even though the creditor has not realized on that security. There are no Arizona cases construing this section in the way urged by Rheads. Further, nothing in A.R.S. § 12–1566 or § 33–814 compels such a result. To the contrary, the statutes are clear that the credit comes into to play *only if* a foreclosure has taken place; in other words, the guarantor gets the credit if and when the creditor gets the property. Until the creditor gets the property, the debtor still owes the full debt, except as it may have been reduced by payments received by the creditor.

The various subsections of these two related statutes cited above are consistent with this result. For example, when so agreed, the creditor may pursue the guarantor without pursuing the property. Notwithstanding the availability of a credit in the event of a foreclosure, there is no "abatement" of the ability of the holder of the guarantee to satisfy its claim out of personal property which is not subject to the underlying lien. Finally, the liability of the guarantor will be reduced "if ... a trustee's sale is held." The contrary implication is clear; if no trustee's sale is held, no such credit is yet due.

If the Plans in the Five Flags and Page cases returned the collateral to SKW, then the Rheads' liability under the guarantee would be obliterated. The transfer of the collateral would be the functional equivalent of a foreclosure, and the "fair market value credit" would be available. The mere existence of collateral, however, is insufficient to reduce the claim. Only a transfer of the collateral or payment on the claim can do that.

 The Rheads' argument that this result would lead to double payment is likewise misplaced. The Bankruptcy Code has an explicit mechanism for dealing with this situation. Having not yet made any payments, the Rheads' have no present claim for reimbursement in either the Five Flags or Page estates, 11 U.S.C. § 502(e); they are entitled, nevertheless, to be subrogated to SKW's rights in accordance with Section 509(a). That section provides that the Rheads will be subrogated to the rights of SKW against Page and Five Flags to the extent that Rheads pay SKW under their Plan. Thus, the Rheads will be entitled, after SKW has been paid in full (including payments from the Rheads), to receive from Page and Five Flags the payments that otherwise would have gone to SKW. SKW will therefore be paid only once and Rheads will be reimbursed for any payments made by them.

### 2. *Is there an Accepting Impaired Class?*

RTC, Holiday Inns and SKW assert that the voting on Debtors' Plan did not produce an accepting impaired class of creditors as required under Section 1129(a)(10) and that, therefore, the Plan cannot be confirmed as a matter of law. The Court disagrees and holds that the requirements of Section 1129(a)(10) have been met.

In light of the Court's ruling on SKW's guarantee claim, it is unnecessary to decide the propriety of the votes of the three unsecured creditors, Arizona Public Service, Norwest Bank or Union Hills. SKW holds a Class 7 claim of at least $1 million and has voted against the Plan. Regardless of whether these parties are creditors or how or whether they voted, the class has rejected the Plan. 11 U.S.C. § 1126(c).

---

**15.** There is no dispute that the Rheads so agreed in this case.

That leaves the question of whether the class consisting of the Maricopa County Treasurer's ("County") claim can be the consenting impaired class required by 11 U.S.C. § 1129(a)(10). The Court holds that it can.

The stipulated facts establish that a timely objection was filed by the County to the Plan. Under the original Plan, the County was treated as an unsecured priority creditor under 11 U.S.C. § 507(a)(7). The County's objection claimed that it was entitled to *secured treatment* because of lien rights created by A.R.S. § 42–312 *et seq.* As a result of this objection, negotiations were commenced between the Debtors and the County to resolve the claim. These negotiations led to a telephone conversation on June 30, 1994, several days prior to the objection date, during which the resolution of the County's objection was discussed.

June 30, 1994, was a Thursday. One day, July 1, 1994, was left before the intervening Fourth of July holiday and the deadline for ballots on July 5, 1994. Apparently (and not surprisingly), no progress on settlement was made that day. On July 5, 1994, the County agreed to withdraw its objection and to vote for the Plan provided that the Plan was amended to treat the County's claim as secured and to pay the County's claim in full within three years. This agreement was memorialized by a letter dated July 6, 1994 from the Rheads' counsel to the County's counsel, and on the next day, July 7, 1994, a ballot was executed and mailed to the Debtors by the County. On the next day, July 8, 1994, the Amended Plan was filed, changing the treatment of the County from unsecured to secured and the payment period from six years to three years, and creating a new class of secured claims, Class 2B, in which the County's claim was put.

The objectors concede that they have no evidence that the County acted in bad faith in casting its ballot. Further, the objectors do not dispute that the County holds a secured claim based upon pre-petition *ad valorem* real property taxes. Therefore, the question presented is whether the county's affirmative vote for the modified treatment contained in the Amended Plan should not be counted either because it was late or because the Plan was amended to reflect the agreement reached.

Section 1127(a) provides that a plan proponent may modify a plan "at any time before confirmation," but further provides that such proponent "may not modify such plan so that such plan as modified fails to meet the requirements of Sections 1122 and 1123 of this title." Section 1127(c) provides that the proponent of the modification shall comply with the disclosure requirements of Section 1125 of this title with respect to the plan as modified.

▪ The modified Plan did not impact upon or affect the rights of any of the objectors. As such, the Plan can be modified without new disclosure and resolicitation of votes. *See Collier on Bankruptcy*, 15th ed., ¶ 1127.03, citing H.R.Rep. No. 595, 95th Cong. 1st sess. 411 (1977), U.S.Code Cong. & Admin.News, (1978), 5787, 6367. RTC argues that Rule of Bankruptcy Procedure 3019 restricts modification of a plan only to circumstances where a plan "has been accepted," and that, prior to the County's affirmative vote, the Plan had not been accepted. However, Rule 3019 cannot modify the substantive provisions of the Code and Section 1127(a) specifically provides that modification can occur at "any time prior to confirmation." A more reasonable reading of Rule 3019 limits its scope to those circumstances where a modification is attempted after acceptance. To read it otherwise is impermissibly to modify the terms of Section 1127(a).

▪ Other creditors, such as the objectors, do not have the substantive right to insist upon non-modification of the Plan. SKW argued at the hearing that since the Plan was "balloted" without the new Class 2B, it is inappropriate to allow the modification to create that new class at this point. Nothing in the Code suggests such a result. Indeed, Section 1127(a) suggests precisely the opposite. The intent of the Bankruptcy Code is to encourage consensual resolution of claims through the plan negotiation process. *See, e.g., In re AVBI, Inc.,* 143 B.R. 738 (Bankr.C.D.Cal.1992); *In re Windsor on the River Assoc., Ltd.,* 7 F.3d 127 (8th Cir.1993). The Bankruptcy Court is a court of equity with a primary focus upon facilitating the reorganization process. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct.

2309, 76 L.Ed.2d 515 (1983). Neither of these goals would be furthered by refusing to recognize the modification to the Plan which provided treatment that the County now accepts.[16]

The issue then becomes whether the consensual resolution of this claim should be ignored because the County's vote was cast after the July 5, 1994 deadline. Given the existence of the July 4, 1994 holiday, it is not difficult to find "excusable neglect" justifying the extension of the voting deadline for the few days required here. *See* Bankruptcy Rule of Procedure 9006; *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership,* —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). Although no specific motion to expand the time was filed by the Debtors, the combination of the modified Plan and the Amended Ballot Report, together with argument of counsel at the initial July 12, 1994 hearing, will be taken by this Court as a sufficient "motion" required by Rule 9006.

Section 1129(a)(10) is a technical requirement for confirmation. It is an obligation for the proponent to fulfill; it is not a substantive right of objecting creditors. Indeed, the purpose and usefulness of Section 1129(a)(10) have often been questioned. *See generally,* David Gray Carlson, *The Classification Veto in Single-asset Cases Under Bankruptcy Code Section 1129(A)(10),* 44 S.C.Law Rev. 565 (1993). A recent report by the prestigious National Bankruptcy Conference recommends its abolition. *Reforming the Bankruptcy Code: The National Bankruptcy Conference's Code Review Project,* Final Report May 1, 1994, Proposal B–1, pp. 276–77. In this circuit, any change of a creditor's rights, whether for the better or for the worse, constitutes impairment and creates the possibility of a "consenting impaired class." *See In re L & J Anaheim Assoc.,* 995 F.2d 940 (9th Cir.1993). If there is such an impaired class and such a class accepts, then 1129(a)(10) is satisfied. Wheth-

er or not the entire exercise was undertaken in good faith, however, is still subject to further proof at the final confirmation hearing. *See* Section 1129(a)(3); *In re L & J Anaheim Assoc.,* 995 F.2d at 943, n. 2.

Therefore, the Court finds that Section 1129(a)(10) has been satisfied.

---

**16.** As pointed out by the Debtors, the creation of the new class is *mandated* by Section 1122 and the cases interpreting it. It is well settled that each holder of a secured claim should be placed in a separate class since no other creditor has rights that are "substantially similar" to those held by that secured creditor. Collier on Bankruptcy, 15th ed., ¶ 1122.03, at 1122–14. The

County admittedly holds a secured and not an unsecured claim. Therefore, the objectors' argument that the County's secured claim cannot be a consenting impaired class since unsecured tax claims are subject to special treatment under 11 U.S.C. § 507(a)(7) is misplaced. *See, e.g., In re Perdido Motel Group, Inc.,* 101 B.R. 289 (Bankr. N.D.Ala.1989).