**In re Thomas F. CASEY, Debtor.**

**Bankruptcy No. 95–03747–B11.**

United States Bankruptcy Court,
S.D. California.

July 11, 1996.

Roy L. Carlson, Jr., Milberg & De Phillips, P.C., Cardiff by the Sea, CA, for Debtor.

John W. Cutchin, Duckor Spradling & Metzger, San Diego, CA, for Creditors Artificial Intelligence Corporation, Steven Sanford, Catherine Casey, Steven Greenberg, and Arstk, Inc.

W. Michael Young, Law Offices of Gordon L. Gerson, San Diego, CA, Michael P. Lane, Brandes, Lane & Joffe, P.C., Phoenix, AZ, for Creditors Dr. Dwight C. Lundell and 6 L Properties Limited Partnership.

James Jay Stoffel, Beberman, Stoffel & Beberman, San Diego, CA, for Creditor Merrill Lynch.

Victor A. Vilaplana, Sheppard, Mullin, Richter & Hampton, San Diego, CA, for Audre, Inc.

## MEMORANDUM DECISION ON ORDER TO SHOW CAUSE

PETER W. BOWIE, Bankruptcy Judge.

This case has troubled this Court virtually since the date it was filed because of the circumstances in which it was filed, and the uses it seeks to make of the Bankruptcy Code.

A cover sheet, a list of 2 unsecured creditors, and a list of 6 creditors, in total, was filed as a "bare-bones" petition on April 14, 1995. The central creditor was debtor's former wife with a scheduled disputed claim set at $14,500,000. The only other listed unsecured creditor was Dr. Lundell, for a loan of $35,000. Dr. Lundell was a colleague in business with Mr. Casey.

On May 16, 1995 debtor filed his Schedules and Statement of Affairs. They showed that debtor was employed as Chief Executive Officer of Audre, Inc., and earned approximately $20,000 per month. His major asset was 4,378,964 shares of Audre Recognition Systems, Inc., which is a publicly traded company. Audre, Inc. is a wholly-owned subsidiary of Audre Recognition Systems, Inc. (ARSI).

The Schedules listed 3 secured creditors, all fully secured by real and personal property. Debtor listed unsecured priority claims of $126,536 to the Internal Revenue Service and $53,176 to the California Franchise Tax Board, both for unpaid 1994 income taxes. As unsecured claims, debtor listed his former wife with a claim that was asserted to be contingent, unliquidated and disputed in the amount of $14,500,000. Also listed as contingent, unliquidated and disputed were claims by 1) Steven Greenberg and Arstk, Inc.; 2) Steven Sanford and Artificial Intelligence; and 3) Dennis DiRicco on a counterclaim in an action pending in Vancouver, British Columbia. The Greenberg and Sanford claims were also based on pending litigation.

The Court set an informal status conference for the case for May 17, 1995. On May 16, debtor filed a written status conference statement. The statement recited that debtor was Chairman of the Board and CEO of ARSI, which was the source of his income. He also operated certain real property as a residence and avocado farm. Debtor valued the real property at $848,971 and stated that the secured claims totalled $561,828.

The statement also recounted the history of debtor and Mrs. Casey's marriage and protracted divorce proceedings. The proceedings were begun in 1985. In 1993, ARSI was joined as a party with power to transfer shares. In January, 1995, after a lengthy non-jury trial, the Superior Court announced its Tentative Decision, awarding Mrs. Casey damages in the amount of $8,058,771, attorneys' fees of $3,422,922, and more than 2 million shares of ARSI. All of debtor's stock was ordered placed in a separate blocked account. Judgment on the Tentative Decision had not been entered as of the bankruptcy filing and was arguably stayed thereafter. In any event, to ensure that the state court could not enter judgment against either debtor or ARSI, the family law action was removed to the Bankruptcy Court in the Central District of California, since it had been pending in Orange County, and a hearing on a motion to change venue to this district had been set.

In his status conference statement the debtor argued that the state court had made multiple errors in rendering its Tentative Decision, most notable of which was that the state family court lacked jurisdiction to render a judgment for damages against either debtor or ARSI. The debtor recognized that he could seek relief from the judgment through available state law procedures, such as a request for reconsideration or motion for new trial, but the debtor felt those efforts would be futile.

Debtor also recognized he could appeal, and asserted that appeal would take 3 years, during which both debtor and ARSI would be irreparably harmed. Debtor argued that ARSI had duties of disclosure because it was publicly traded, which had already adversely impacted trading in and the value of ARSI

stock during the trial. Debtor stated that ARSI could not afford to post a bond to stay execution on any judgment pending appeal. Debtor also stated that if he were forced to liquidate his share holdings the estate would be liable for substantial capital gains taxes.

At the status conference, the fuller picture of debtor's rationale for the bankruptcy filing was disclosed. Debtor believed that since no judgment had been entered in the state court action, the decision in that matter had no issue preclusive effect in bankruptcy, whether in a nondischargeability proceeding under 11 U.S.C. § 523(a), or otherwise. Debtor believed he could relitigate the entire matter in the Bankruptcy Court through proceedings such as a § 523(a) action, by objection to claim, or by a motion to estimate claim under 11 U.S.C. § 502(c).

On June 2, 1995 Mrs. Casey filed a motion for relief from stay to allow entry of the state court written statement of decision and entry of judgment, but agreed to take no steps to enforce any judgment without further order of this Court. Debtor opposed the motion, arguing first that the state court action had been removed so the matter was moot. Debtor again argued that the state court had lacked jurisdiction to render a damages award. Debtor also asserted that even if the state action were remanded, and relief from stay granted to allow entry of a judgment, the debtor would file a notice of appeal, thereby depriving the action of preclusive effect under California law. Lastly, debtor again argued that granting relief would harm ARSI (which was not a debtor at the time). A motion for remand was set for hearing on the same date as the motion for relief from stay. After the hearing, the motion for remand was granted, and relief from stay was granted to allow entry of judgment in the family court matter.

On or about July 18, 1995, Ms. Casey, Sanford, and Greenberg each filed complaints objecting to the dischargeability of the debts allegedly owed to them. However, service of those complaints was withheld for approximately 150 days, even though the debtor stated in a status conference statement filed August 10, 1995 that he knew they had been filed. Those issues have been addressed in separate orders.

On August 11, 1995 debtor filed a proposed plan of reorganization, but no accompanying disclosure statement. The plan was simple: all assets revested in the debtor and he would liquidate them over time at his discretion and as necessary to make periodic payments to the secured and priority tax creditors. The plan contemplated that the debtor would object to certain claims and make no payment on the disputed portion of those until all litigation and appeals had been exhausted, or the orders had otherwise become final. As to unsecured claims, the plan simply provided that those creditors would be paid not less than 10 per cent of their finally allowed claim by the seventh anniversary of the effective date of the plan.

On or about September 14, 1995 the family court signed its Statement of Decision and entered judgment accordingly. On September 18, 1995 ARSI and Audre, Inc. filed for bankruptcy in this district. On or about October 2, 1995 Mrs. Casey, Sanford, Greenberg and the companies of the latter two filed a motion to dismiss the Casey bankruptcy, or for conversion or appointment of a trustee. With an intriguing dose of rhetoric, debtor justified filing bankruptcy in his October 13, 1995 status conference statement as follows:

> Debtor is utilizing the lifeboat known as the Bankruptcy Code powered by the winds of equity to assist him in his navigation. While those winds of equity may blow softly now in the face of the tsunami of litigation, Debtor is confident that they will safely guide him to the shores of a fresh start.

Debtor opposed the motion to dismiss, asserting that there was a legitimate bankruptcy purpose to his case. He asserted by declaration that his assets were insufficient to either satisfy Mrs. Casey's judgment or fund an appeal bond which would stay execution on the family court judgment. He pleaded that he would be financially destroyed if the case were dismissed, and that his 12 years of work at Audre would be wiped out. He also claimed that dismissal would deprive him of his appeal of the state

court judgment, although he did not explain how. Again, he argued the merits of the family court decision.

By Memorandum Decision filed January 8, 1996 the Court denied without prejudice the motion to dismiss, convert or appoint a trustee. The Court struggled with the motion and decision, having already stated its view of the use of bankruptcy to avoid posting a bond pending appeal in *In re Boynton*, 184 B.R. 580 (Bankr.S.D.Cal.1995). The Court felt there were factors which distinguished the *Casey* matter from *Boynton*, at the time. Specifically, it looked like debtor might be able to offer more to creditors than in a Chapter 7 because of his salary, and that he might be able to pursue the appeal without drawing on the property of the estate to pay for it, thus avoiding the anomalous circumstance of using bankruptcy to keep assets from creditors and then consuming those same assets to wage the appellate fight with the frustrated creditor. Of particular concern to the Court was the fact that debtor was the president and CEO of a publicly traded company whose ownership and management might be substantially altered if a creditor could enforce a judgment against the debtor's shares. For those reasons, and the others set out in the Memorandum Decision, the motion was denied.

In the interim, on December 8, 1995 debtor filed a disclosure statement for the August, 1995 plan. Debtor proposed that all property revested in him, that he would use some of his post-petition wages to fund his continued operation of the avocado farm (and personal residence), although neither would provide any significant revenue for creditors. Unsecured creditors would receive their distributions toward the end of the 7 year plan, after all appeals had been pursued. Debtor estimated that the allowed unsecured claims, when ultimately allowed, would range from a low of $41,837 to a high of $89,523,530. Notwithstanding those numbers, debtor continued to propose that unsecureds would receive not less than 10%, nor more than 50% of their allowed claims.

Debtor's August, 1995 plan violated the absolute priority rule of 11 U.S.C. § 1129(b) and could not be crammed down over the objection of the controlling unsecured creditor group, Mrs. Casey, Sanford, Greenberg and their companies. In addition, the plan as proposed also would have provided less to unsecureds than they would receive in a Chapter 7 if the claims as allowed were toward the lower end, and if the claims were allowed toward the upper end the debtor could not pay the required 10%.

On January 31, 1996 debtor filed an amended plan and disclosure statement. The primary change in the amended documents was a proposal that while all the assets would revest in the debtor, he would hold them "in trust" for the benefit of creditors. He would continue to manage and control them, however, until it became necessary to liquidate them in accordance with a proposed liquidation schedule. No separate trust was to be created. Distribution to unsecureds remained a minimum of 10% at the low end but was increased to up to 100% at the high end. Again, the plan drew objections for violation of various provisions of § 1129, but particularly the absolute priority rule of 1129(b). And, again, the Court declined to approve the proposed disclosure statement.

At this point in the proceedings, the Court's concern about debtor's ability to reorganize had increased significantly. Indeed, there was question whether debtor had any intent to reorganize. Consequently, the Court issued an order to show cause why it should not reconsider its earlier ruling on the creditors' motion to dismiss, and thereafter dismiss or convert the case. The debtor, of course, opposed the suggestion of dismissal or conversion, and in partial opposition filed a third plan on the day of the hearing. Because neither the Court nor any party other than the debtor had had an opportunity to review debtor's latest effort, the Court requested supplemental briefing, after which the matter would be taken under submission.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court of the Southern District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G), and (O).

## DISCUSSION

The Order to Show Cause was issued after the debtor presented two plan proposals that were patently unconfirmable. Since the Order to Show Cause was issued, the debtor has submitted a third version. This third plan provides for the liquidation of all non-exempt assets, continuing payments to secured creditors pending liquidation, and the maintaining of proceeds from the liquidation in an interest bearing account pending the determination of allowed claims. The debtor submits that the chapter 11 was filed in good faith, that it will satisfy the absolute priority rule after a present value analysis is completed, and that it should not be dismissed.

The debtor attempts to distinguish the present case from other chapter 11's where filings have been dismissed for bad faith because those cases usually involved situations where the debtor was solvent and the filing was merely a litigation tactic. *In re Karum Group, Inc.*, 66 B.R. 436 (Bankr. W.D.Wash.1986); *In re Smith*, 58 B.R. 448 (Bankr.W.D.Ky.1986). The debtor submits that he is insolvent and cannot post a supersedeas bond. Further, he submits that denial of the opportunity to reorganize would cause financial destruction and would deny any recovery to any creditors other than Mrs. Casey and her associates. The debtor contends that a liquidating chapter 11, however, will allow the debtor to maximize the assets of the estate for creditors and achieve the best recovery for all creditors. The debtor also maintains that courts have not dismissed chapter 11 filings for bad faith in this circumstance, but have permitted debtors to attempt to reorganize or liquidate. *In re Ford*, 74 B.R. 934 (Bankr.S.D.Ala.1987). Finally, the debtor claims that where the filing is motivated by legitimate reorganization purposes and not solely to hinder and delay creditors, there is no bad faith in the filing. *In re Clinton Centrifuge*, 72 B.R. 900 (Bankr.E.D.Pa.1987). He claims that this is not an instance where the bankruptcy was meant to delay creditors, where the debtor had no assets to fund a plan, or where the debtor could have either satisfied the judgment or posted a supersedeas bond in lieu of filing.

Mrs. Casey claims that this third plan, like its predecessors merely postpones payment to unsecured creditors, while allowing the debtor to pursue his appeal of the family court judgment, without having posted a supersedeas bond. She claims that the debtor still has full and exclusive control over the timing and amount of the sales of assets, and he retains the affirmative litigation assets. Mrs. Casey further claims that this plan provides less to creditors than the first two because the debtor no longer makes contributions from his post-petition wages. Additionally, she believes that the plan attempts to disenfranchise creditors from the claim objection process following plan confirmation, and it puts the burden of monitoring and policing debtor's compliance with the plan on creditors.

Mrs. Casey claims that this bankruptcy was filed in bad faith as a litigation tactic, as shown by the non-feasibility of debtor's several plans. This case is over a year old and debtor has submitted three unconfirmable plans, she argues. This is causing delay to creditors' attempts to collect on their claims. Further, Mrs. Casey alleges that the debtor has not been diligent in pursuing the state court litigation. The debtor's proposed plan would continue this delay for several years. Mrs. Casey believes that the proposal to put the assets in a trust under debtor's control violates the absolute priority rule.

The debtor has based the feasibility of all his plans on his belief that the appeal will be successful. Mrs. Casey states that he has nothing but his own speculation to support this conclusion. Mrs. Casey asserts that there is no way that debtor can even pay 10% on claims if only the Casey judgment of $12,000,000 is allowed. She states that the market value of debtor's assets available for distribution to unsecureds totals only about $787,621.

The matter before the Court presents two central issues. The first is whether debtor has finally proposed a potentially confirmable plan. The second presupposes that debtor's latest plan is not confirmable, and poses the question of whether debtor's continuing inability or unwillingness to propose a confirmable plan indicates that this bankruptcy is not

predicated on legal good faith, and therefore should be dismissed.

■ In determining whether a debtor satisfies the good faith requirement of a chapter 11 petition, one of the factors courts consider is whether the debtor has the ability to reorganize. To reorganize or to complete an orderly liquidation plan the debtor must be able to present a plan that meets the confirmation requirements of 11 U.S.C. § 1129(a). That section sets out all the requirements for the confirmation of a plan of reorganization. Out of thirteen subsections of requirements to § 1129(a), only § 1129(a)(8) is not mandatory.[1] Section 1129(b) provides that, if all the other requirements of subsection (a) are met, a court shall confirm a plan that does not discriminate unfairly, and is fair and equitable, with respect to each dissenting class of claims or interests that is impaired under the plan. 11 U.S.C. § 1129(b)(1). Section 1129(b)(2) provides a non-exclusive list of requirements for a finding that a plan is fair and equitable. These requirements include the absolute priority rule which is codified at §§ 1129(b)(2)(B)(ii) & (C)(ii). This rule provides that all senior interests must be provided for in full before a junior interest, including equity, can receive or retain any interest under the plan. 11 U.S.C. §§ 1129(b)(2)(B)(ii) & (C)(i).

■ The debtor claims that whether or not the plan satisfies the absolute priority rule can only be answered by doing a present value analysis of all claims and comparing that to the value of assets to be liquidated. The debtor submits that his plan provides up to 100% on allowed unsecured claims. The debtor points to a BAP decision that ruled that § 1129(b)(2)(B) only requires that a dissenting creditor's claim be provided for in full, not paid in full as of the effective date. *In re Johnston*, 140 B.R. 526, 528 (9th Cir. BAP 1992). On appeal the 9th Circuit clarified the *Johnston* ruling. The Court of Appeals held that a court must be satisfied that senior claimants will be paid in full before junior claimants receive anything. *In re Johnston*, 21 F.3d 323, 330 (9th Cir.1994). Thus, even if the plan states that claims will

be provided for in full, the Court must be independently satisfied that performance of the plan will so provide.

The debtor maintains that this Court can determine if the debtor can provide full payment only by analyzing the claims as allowed, not as filed. Since these are allegedly unliquidated, contingent and disputed, the debtor believes that the Court needs to analyze the merits of the claims. Until such analysis, the debtor's plan provides that the assets of the debtor will be placed in a trust upon liquidation. The debtor believes that such a plan satisfies the 9th Circuit interpretation of the absolute priority rule because the debtor claims to not have control of the trust nor an interest in estate property.

This Court disagrees with debtor's characterization of his own plan terms. First, sections 1.1.23 and 6.1.5 of the latest plan provide that all litigation claims held by the estate will "be transferred to and become assets of the Reorganized Debtor on the Effective Date." Section 8.2 makes clear that any recovery will be property of the Reorganized Debtor.

The latest plan, at 6.1.2 states in pertinent part:

> Property of the Estate ... which is burdensome to the Estate and has no or little value to the Estate shall be abandoned to the Debtor 60 days after the Effective Date upon notice to all creditors and order of the Court. Any other property of the Estate which is burdensome to the Reorganized Debtor may be abandoned to the Debtor or a secured creditor after the Effective Date upon notice to all creditors and order of the Court.

That language raises the spectre of the Supreme Court's decision in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). This Court is persuaded that debtor's latest effort violates the absolute priority rule of § 1129(b), and would not be confirmable over the objection of an unsecured class of creditors, which would be dominated by Mrs. Casey.

---

1. This subsection requires that each class of claims or interests has either accepted the plan or is not impaired under the plan. 11 U.S.C. § 1129(a)(8)(A) & (B).

Debtor's arguments in support of his latest plan, as debtor would amend even that version, disclose the aspect of this case which continues to be the most troubling. Debtor has taken the position since the first appearance in this case, and the timing of the bankruptcy filing suggests it was the design of the filing, that by filing bankruptcy before the family court could enter a judgment on its already announced Tentative Decision, that Decision would be of no force and effect in issue preclusion or otherwise. Debtor has argued that it is contingent and unliquidated, even though it is the product of a non-jury trial over a three week period in 1994. Debtor asserts the same is true even after relief from stay was granted to allow entry of judgment because debtor timely filed a notice of appeal and under California law judgments are not final when an appeal is pending. Consequently, argues the debtor, it is entitled to ask the Court to estimate Mrs. Casey's claims under 11 U.S.C. § 502(c), or to collaterally attack the state court judgment by use of the claims objection process.

This Court holds that the judgment of the family court is neither contingent nor unliquidated, even though not "final". Therefore, estimation of Mrs. Casey's claim under § 502(c) is not permissible. *In re Rhead,* 179 B.R. 169 (Bankr.D.Az.1995).

The real question is whether debtor may use the claims objection process to collaterally attack a state court judgment. As this Court understands California law, the judgment is not "final" because a timely appeal was taken. That does not invalidate the judgment, however. To the contrary, Mrs. Casey could enforce that judgment by levy and execution on assets of the defendants unless enforcement was stayed by order of a court or by posting a bond on appeal. Debtor asserts he could not post a sufficient bond because his assets are inadequate. In January, 1995, when the Tentative Decision was announced, the family court judge ordered the immediate release to Mrs. Casey of all the shares in the custodial account. On request of Mr. Casey's counsel, the judge stayed that order. The judge gave debtor time to post a $5,000,000 bond or seek other relief. When that had not been accomplished

by March 13, 1995 the judge ordered the shares sold. Debtor filed a petition for writ of mandamus and obtained a further stay, which was dissolved on March 27, 1995 when the writ was denied. This bankruptcy followed, and the automatic stay prevented further steps toward liquidation.

■ The Court accepts debtor's assertion that he could not afford to post a bond pending appeal on the record as it presently stands. But that begs the question. It is clear that bankruptcy is not a permissible substitute for an appeal bond, in itself. There must be a legitimate bankruptcy purpose to the filing before a debtor will be permitted to avoid traditional state law creditor remedies after judgment. *In re Boynton,* 184 B.R. 580 (Bankr.S.D.Cal.1995). Debtor argues in this case the legitimate bankruptcy purpose is found in the availability of the claims objection process to litigate de novo or collaterally attack the judgment of the state family law court. Debtor argues, in effect, that he can employ the claims objection process to litigate anew the issues already decided by the state court after lengthy trial, or, in the alternative, that he should be permitted to pursue the appeal of the state court judgment without having to post a bond, as state law would require to postpone enforcement.

The cases discussing the propriety of using bankruptcy as a substitute for an appellate bond have been discussed in this Court's prior Memorandum Decision. The inquiry in that Decision, and to the present, has been whether there is a legitimate bankruptcy purpose to this filing. In the original, early analysis it looked like debtor might have a prospect of reorganization. Coupled with concerns about the impact of dismissal on ownership and management of ARSI, the original motion to dismiss was denied. Debtor's multiple plan proposals since have been transparent, as well as unconfirmable. In each, debtor proposes to continue to seek by claim objection or appellate review, without bond, to attack the family court judgment. Interestingly, his latest plan provides for liquidation of his assets and payment from those proceeds of the estate's administrative claims. Those would include the fee claims

of the attorneys handling the appeal from the judgment. If debtor's approach were countenanced, Mrs. Casey is not only deprived of her state law right to enforce her judgment against debtor's assets, or the alternative state law right of an adequate bond, but those very assets to which state law would allow her to resort will be used to fund the fight against her.

Debtor argues that his latest plan is a liquidating one, and that liquidation plans are permissible. The Court agrees that liquidation plans are permitted in Chapter 11, but disagrees that debtor's proposed plan is a bona fide liquidating plan, because debtor doesn't intend to make any distribution to general unsecured creditors until every one of those claims is finally allowed, which is defined in the plan to mean all appellate avenues, including *certiorari*, have been exhausted. Sections 10.2, 1.1.22.

Debtor does not concede the foregoing, but argues that in any event there are other general unsecured creditors, albeit most are scheduled by debtor at $0. But it is true that proofs of claim have been filed by Sanford, Greenberg and their respective companies. One set of those claims covers their respective interests in Mrs. Casey's judgment. Another set is for the anticipated results of non-bankruptcy court litigation which has yet to proceed to judgment. Debtor argues that he is entitled to use the bankruptcy process to obtain a stay of that litigation, to estimate their claims, or determine their claims by use of the claims objection process. In another case, this Court might well agree. But in this case, which was commenced when it was, first, to prevent entry of any judgment in the family court litigation, and second, to litigate in a collateral forum the same state law issues, this Court views the matter differently.

Sanford, Greenberg, and their companies joined in the original motion to dismiss, and support dismissal on the OSC, notwithstanding that Mrs. Casey would then be in a position to enforce her judgment, which would likely exhaust debtor's assets, making them unavailable to Sanford, et al., if they prevail in their litigation. Of course, they have apparently acquired an interest in Mrs. Casey's judgment, which may explain their support for dismissal. In any event, had they opposed dismissal because they wanted to participate ratably in a distribution through bankruptcy, dismissal would likely be denied. But they do not. In this Court's view, debtor should not be able to maintain this case in Chapter 11 by arguing that even if the Court finds the case is a bad faith filing as to Mrs. Casey's substantial claim, the existence of other creditors should allow the debtor to remain in bankruptcy even when those creditors want to be elsewhere.

The remaining general unsecured claim is for $35,000 by Dr. Lundell, who opposes dismissal, arguing his loan may never be repaid if the case is dismissed. Dr. Lundell is a business colleague of debtor's and is an investor in and board member of ARSI. Dr. Lundell is not a traditional arms-length lender or creditor. Moreover, if Dr. Lundell's claim was finally allowed, along with Mrs. Casey's, he would not receive more than ten per cent of his claim, $3,500, if debtor is even able to perform at the ten per cent level. In this Court's view, it would be inappropriate, perhaps even unconscionable, to allow Dr. Lundell's claim to control the fate of Mrs. Casey's judgment which is more than 357 times larger.

Almost the entirety of debtor's creditors at risk seek dismissal. The secured creditors are not at risk and the priority creditors have their non-bankruptcy law remedies. Debtor has yet to propose a confirmable plan, after three written attempts and additional orally proposed modifications. Debtor would consume assets to which the judgment creditor would otherwise be able to look in fighting the appeal of the judgment, in derogation of state law remedies of a judgment creditor.

There often is tension between provisions of state law and the Bankruptcy Code and Rules. In circumstances like those presented by this case, there must be a legitimate bankruptcy purpose before state law remedies are upset. In this case the Court finds there is no such legitimate bankruptcy purpose. To the contrary, debtor wants to use bankruptcy to defeat the state law appeal bond requirement, or alternatively to relitigate the state court trial de novo and bypass

the state appellate review process and its applicable standards of review. Neither are legitimate bankruptcy purposes. Yet each version of debtor's plan comes back to that same point.

## CONCLUSION

For all the foregoing reasons, the Order to Show Cause is sustained, and debtor's Chapter 11 bankruptcy is dismissed as having been filed and prosecuted in legal bad faith.

IT IS SO ORDERED.