**In re GLOBAL OCEAN CARRIERS LIMITED, et al., Debtors.**

**No. 00–955(MFW) to 00–969(MFW).**

United States Bankruptcy Court, D. Delaware.

July 5, 2000.

**34**

MARY F. WALRATH, Bankruptcy Judge.

This case is before the Court on the request of Global Ocean Carriers Limited ("Global Ocean") and fifteen of its affiliates [2] (collectively "the Debtors") for confirmation of their Modified First Amended Plan of Reorganization ("the Modified Plan"). In connection with confirmation, the Debtors also request that their Motion for substantive consolidation be granted and that the ballot of Credit Lyonnais in favor of the Modified Plan be accepted (though filed beyond the voting deadline). The holders of approximately $92 million of the $126 million in outstanding notes ("the Ad Hoc Committee of Noteholders") supports the Debtors' requests. A small noteholder and minority shareholder, Arabella Holdings, Inc. ("Arabella") objects to the relief requested by the Debtors and asks that the cases be dismissed.

For the reasons given below, confirmation of the Modified Plan is denied. Substantive consolidation is also denied without prejudice to the Debtors renewing their motion on notice to all affected creditors. However, Arabella's motion to dismiss these cases is denied, since the Debtors are eligible to file the instant cases.

## I. FACTUAL BACKGROUND

The Debtors are involved in the international shipping industry. Global Ocean and most of the other Debtors are headquartered in Athens, Greece.[3] The books

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Rule 9014.

2. Global Ocean owns 100% of the common stock of Debtors Mackenzie Shipping Corporation ("Mackenzie"), Zephaniah Pte Limited, Iphigenia Pte Limited and Marine Services Corporation ("Marine"). Mackenzie owns 100% of the common stock of Debtors Malandrino Maritime Company Limited, Selero Shipping Company Limited, Petra Maritime Company Limited, Tolmi Shipping Company Limited, Legrena Marine Company Limited, Iphigenia Pte Limited, Queensland Shipping Company Limited, Melitea Shipping Company Limited, Hedgestone Shipping Company Limited, Korinia Shipping Company Limited and Filiria Marine Company Limited. (The latter three are referred to collectively as "the Hanjin Debtors.") Both Global Ocean and MacKenzie own other subsidiaries that have not filed chapter 11 petitions. (Disclosure Statement at p. 4, n. 6.)

3. Two of the Debtors are headquartered in Singapore as required by its statutes.

and records of the Debtors are located in Athens, Greece. The Debtors are incorporated in Liberia, Cyprus or Singapore with the exception of Marine which is incorporated in the United States, in Delaware.

Global Ocean is the ultimate parent of all the Debtors; the other Debtors are direct or indirect subsidiaries of Global Ocean. Certain of the Debtors own ocean-going vessels. Each vessel is owned by a separate subsidiary for liability purposes. The Debtors collectively own 10 feeder container vessels and 2 Panamax dry bulk carriers.

The vessels are maintained and operated through a non-debtor, Sovereign Navigation Corporation ("Sovereign")[4], pursuant to a Management Agreement with Global Ocean. (Exhibit A–9.) Sovereign performs the general administrative tasks for the Debtors, maintains the books and records of all the Debtors, collects the revenues and deposits them to the bank accounts of Global Ocean, and supervises the chartering and maintenance of the vessels. The daily maintenance, provisioning and chartering of the vessels is done by Tsakos Shipping and Trading, S.A. ("Tsakos Shipping"), under a Technical Management Agreement with Sovereign. (Exhibit A–33.) Most of the vessels are under charter to other companies. Many of the charters are at market or above market rates and are due to expire relatively soon.

Global Ocean is a publicly traded company whose stock was registered on the American Stock Exchange until shortly before the bankruptcy filing. The Tsakos family controls more than 50% of the stock. (Exhibit D–5.) Global Ocean owes approximately $51 million to Credit Lyonnais, which is guaranteed by the Hanjin Debtors and is secured by a first preferred ship mortgage on each of the three Hanjin vessels. In 1997, Global Ocean issued $126

million in 10 1/4% Senior Notes due 2007 ("the Notes"). The Notes were guaranteed by all the other Debtors. The Notes, though unsecured and subordinated to certain senior secured debt, restricted the Debtors' ability to grant security interests in their assets, including the vessels. (Exhibit A–20 at pp. 10, 11, 104.)

Over the past several years the global shipping industry has been in a recession, with vessel values dropping to a five year low in the summer of 1999. Because of deteriorating charter rates and long periods of unemployment of some of its vessels, the Debtors suffered a net loss of $13.5 million in 1998. Concerned about their ability to meet interest payments due on the Notes, the Debtors met in May, 1999, with representatives of the owners of a vast majority of the Notes for purposes of restructuring the Notes. (Exhibit A–16.) An Ad Hoc Committee of Noteholders was formed and negotiations resulted in an agreement to a restructuring in the fall of 1999. Certain of the Committee members executed a Lock-up Agreement. (Disclosure Statement at Exhibit B.)

At the insistence of the Ad Hoc Committee of Noteholders, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on February 14, 2000. On that same date, the Debtors filed their initial joint Plan of Reorganization and Disclosure Statement. That Plan provided for payment in cash to Noteholders of 50% of their claims on the Effective Date. All other creditors were to be paid in full in accordance with their normal terms and shareholders of Global Ocean would be eliminated. All of the stock in Global Ocean would be issued to Marmaron Company Limited ("Marmaron"), which is owned by Maria Tsakos, in exchange for new capital up to $10 million. Maria Tsakos is the daughter of Captain Panagiotis

---

4. Nikolas Tsakos owns 70% of Sovereign and owns 7.45% of the stock of Global Ocean. (Exhibit D–5.) An amended (and the latest) schedule 13D filed with the SEC on October 25, 1996, shows that his father, Captain Pana- giotis Tsakos, is the largest shareholder (over 30%) of Global Ocean and leads a group controlling well over 50% of the shares of Global Ocean. (*Id.*)

Tsakos and the sister of Nikolas P. Tsakos, together the largest existing shareholders. Global Ocean would retain ownership of the other Debtors.

At the request of the Debtors and the Ad Hoc Committee of Noteholders, the plan process was scheduled on a relatively fast track, to assure that the restructuring was concluded by June 30, 2000. The Disclosure Statement was approved, over objections by Arabella, on March 24, 2000, after certain amendments were made to it and the Plan. Voting packages were required to be mailed by March 31, 2000, ballots were due on April 28, 2000, and the confirmation hearing was originally scheduled for May 8, 2000.

After voting on the Plan, however, the only impaired class (the Noteholders) rejected the Plan under the numerosity test. That is, although owners of over $98 million in amount of the outstanding Notes voted to accept the Plan (almost $6 million voted to reject), 321 of the 497 Noteholders voting on the Plan rejected it. Thus, the Plan has been rejected by the vast majority of the small Noteholders, but accepted by the large institutional Noteholders which own the largest amount of Notes.

Opposition to the Plan has been spearheaded by Arabella, an investment company owned by Mr. and Mrs. Katsamas. Mr. Katsamas has been in the shipping industry for twenty years. In December of 1999, Arabella purchased a small number of shares in Global Ocean for $10,000 and purchased $150,000 in face amount of Notes for $55,000. Mr. Katsamas testified that he did so based on his knowledge of the industry and the upward swing in values of vessels since the Summer of 1999. The valuation experts who testified on behalf of the Debtors confirmed that the industry has recovered since last year and that vessel values (and charter hire rates) continue to rise. Mr. Katsamas said he invested in Global Ocean with the expectation that its value would increase as the industry recovered.

After the Plan was rejected by the Noteholders, the Debtors filed the Modified Plan which changed the treatment of Credit Lyonnais in a manner which the Debtors assert impairs it. A ballot was filed by Credit Lyonnais accepting the Modified Plan. The Debtors also filed a Motion for substantive consolidation of the Debtors' cases. In a telephone conference on scheduling and discovery issues, the Debtors asked for expedited consideration of their substantive consolidation motion so that it could be heard at the confirmation hearing, which was rescheduled for June 5, 2000. We granted that request.

The confirmation hearing commenced on June 5 and continued on June 7, 15 and 23. At the conclusion of the testimony, we heard oral argument and held the matter under advisement.

## II. JURISDICTION

This Court has jurisdiction over these matters, which are core proceedings pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), (L) and (O).

## III. DISCUSSION

The Debtors, Credit Lyonnais, and the Ad Hoc Committee of Noteholders all support confirmation of the Modified Plan. To effectuate the Modified Plan, the Debtors ask us to grant their substantive consolidation motion and allow the ballot of Credit Lyonnais, though it was not filed within the original voting deadline.

Arabella objects to the Debtors' requested relief and also asks that we dismiss these chapter 11 cases asserting that the Debtors are not eligible to file under the Bankruptcy Code.

Because it bears on whether we can or should decide all the other issues, we address Arabella's motion to dismiss first.

### A. Motion to Dismiss

Arabella asserts that none of the Debtors are eligible to file a case under

the Bankruptcy Code. Section 109(a) of the Code articulates who is eligible to file a petition in bankruptcy:

> Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor under this title.

11 U.S.C. § 109(a).

The test for eligibility is as of the date the bankruptcy petition is filed. *See, e.g., In re Axona International Credit & Commerce, Ltd.,* 88 B.R. 597, 614–15 (Bankr.S.D.N.Y.1988). The test must be applied to each debtor. *Bank of America v. World of English,* 23 B.R. 1015, 1019–20 (N.D.Ga.1982)(even where parent is eligible to file, subsidiary must be tested separately to see if it is eligible). The burden of establishing eligibility is on the party filing the bankruptcy petition, in this case the Debtors. *See, e.g., In re Secured Equipment Trust of Eastern Air Lines, Inc.,* 153 B.R. 409, 412 (Bankr.S.D.N.Y. 1993) and cases cited therein.

In this case, only one of the Debtors, Marine, is incorporated in the United States. Marine was incorporated in Delaware in 1991. The others are incorporated in Cyprus, Singapore or Liberia. Most of the Debtors have their headquarters in Athens, Greece. The Debtors admit that none has a place of business in the United States, except Marine. (Exhibit A–31.)

Since Marine is incorporated in Delaware, the Debtors assert that its stock is located in Delaware. *See* Del. Gen. Corp. L. 169 ("the situs of the ownership of the capital stock of all corporations existing under the laws of this State ... shall be regarded as in this State"). Thus, we conclude that Global Ocean, the owner of the stock of Marine, has property in Delaware.

The Debtors also assert that they have other significant contacts with, and in, the United States. Global Ocean had an initial public offering of its stock in the United States in 1988 and its stock has traded on the American Stock Exchange until recently. In 1997, Global Ocean also issued the Notes in the United States, using American attorneys and investments bankers. All the Debtors, who guaranteed the Notes, submitted to the jurisdiction of the State of New York for all issues arising under the Notes and appointed Marine as their agent for service of process. (Indenture at § 11.14.) When the Debtors sought to renegotiate the terms of the Notes, they met with the Ad Hoc Committee of Noteholders in the United States and negotiated with them through American representatives.

Further, the Debtors presented evidence that some of their vessels have visited ports in the United States on a regular basis. (Exhibit D–9.) However, the Debtors' Exhibit shows that only four of the Debtors' twelve vessels visited the United States for a total of 143 days in the fifteen months prior to the petition date. One of the vessels was in the United States only once (in November, 1999). We do not find this evidence persuasive. Having some business in the United States (and even being physically present in the United States for 30% of the year) is insufficient to constitute having a place of business in the United States.

Further, none of the Debtors' vessels were in the United States on the day the petitions were filed, which is the dispositive date. *See, e.g., Axona,* 88 B.R. at 614. We hold that it is insufficient for purposes of establishing eligibility that the Debtors had property in the United States at some time in the prior year. The Debtors must have property in the United States at the time they actually file their bankruptcy petition. *Id.*

The Debtors assert, however, that they did have property in the United States on the petition date, specifically business documents and funds in bank accounts. The documents were produced by the Debtors to the Ad Hoc Committee of Noteholders

during the course of their negotiation of the Lock-up Agreement and the Plan. The Debtors assert that these documents are their property and thus sufficient to establish their eligibility to file bankruptcy in this country. *See, e.g., In re Spanish Cay Co., Ltd.,* 161 B.R. 715, 721 (Bankr.S.D.Fla.1993)(advertising and marketing material, together with office equipment and a bank account containing $100, was sufficient property in the United States to create eligibility to file bankruptcy).

However, in this case, the business documents in the hands of the Ad Hoc Committee of Noteholders are not original books and records of the Debtors; they are merely copies. It does not appear that the Debtors expect the return of those. We do not, therefore, find that those documents are property of the Debtors for purposes of establishing eligibility to file bankruptcy in the United States.[5]

The Debtors did have property in the United States on the petition date, however, namely funds in various bank accounts. *See, e.g., In re McTague,* 198 B.R. 428, 429 (Bankr.W.D.N.Y.1996)($194 in bank account was sufficient property for bankruptcy eligibility). One account was at The Bank of New York in New York City (an account in use since 1989) and another was at Chase Manhattan Bank in Delaware (opened shortly before the bankruptcy filing). Both these bank accounts are in the name of Global Ocean. The Debtors' deputy financial officer, Mr. Panagopoulis, testified that the funds in the bank accounts represent the revenues from the operations of all the vessels. Those revenues belong to the vessel owning subsidiaries and, through their ownership of the subsidiaries, the various other Debtors. Mr. Panagopoulis also testified that the funds of the various Debtors have always

been commingled and deposited into the Global Ocean account and that none of the other Debtors even have bank accounts.

Arabella sought to discredit this testimony by cross-examining Mr. Panagopoulis about the New York bank account statement for July, 1999. (Exhibit A–21.) That statement showed that in July, 1999, the Debtors withdrew over $4 million from the New York bank account, reducing the funds therein to approximately $10,000. (It was in July, 1999, that the Debtors defaulted on an interest payment due to the Noteholders in the amount of approximately $6.5 million.) Since that time, the Debtors have admitted that that account has had minimal funds. Instead, the Debtors' vessel revenues have been deposited into the Royal Bank of Scotland account of Global Ocean located in Greece.

■ It is not relevant, as Arabella suggests, that there is only a relatively small amount in the Debtors' bank accounts in the United States (less than $100,000 in both). As the Court in *McTague* concluded:

> Nonetheless, $194 in a bank account is clearly "property," and at least two courts have held that such an account is property "in" the district in which the deposit account is located, even though bank deposits may be viewed as being "in" the place of residence of the depositor for certain other purposes.

> Consequently, as applied to the case at bar, the statute does not appear to be vague or ambiguous, and it seems to have such a plain meaning as to leave the Court no discretion to consider whether it was the intent of Congress to permit someone to obtain a bankruptcy discharge solely on the basis of having a dollar, a dime or a peppercorn located in

---

5. To hold otherwise would be to expand bankruptcy eligibility beyond all bounds, by making any entity with a copy of any business record in the United States eligible. Since the eligibility test of section 109 is applicable to involuntary petitions, as well as voluntary

petitions, this could result in the filing of bankruptcy petitions in instances where there was no legitimate expectation that the laws of the United States would apply. *See, e.g., Axona,* 88 B.R. at 604–06.

the United States. The Court will so rule.

Therefore, the Court concludes that ... the language of § 109(a) is clear, and the Court does not have discretion to look behind the language and declare that the quantity of property in the United States will be decisive of eligibility to be a debtor under the Code.

198 B.R. at 431–32.

Thus, we conclude that the bank accounts constitute property in the United States for purposes of eligibility under section 109 of the Bankruptcy Code, regardless of how much money was actually in them on the petition date.

However, Arabella asserts that the Debtors' argument that the funds in the account represent property of all the Debtors is incorrect. On cross-examination, Mr. Panagopoulis admitted that the revenues from the Hanjin vessels were always deposited into Global Ocean's account at Credit Lyonnais in France, as required by the preferred ship mortgage on those vessels. Thus, Arabella asserts that none of the funds of the Hanjin Debtors were deposited into the New York bank account.[6]

The Debtors rely heavily on the *World of English* decision which held that claims by subsidiaries to funds in their parent's bank account located in the United States constituted sufficient property in the United States for eligibility purposes under section 109. 23 B.R. at 1023.

The Debtors also point to the existence of retainers paid by the Debtors to their bankruptcy counsel as evidence of the requisite property in the United States. Before the petitions were filed, retainers totaling $400,000 were paid to bankruptcy counsel, which still hold those funds. The Debtors assert that such retainers held in escrow by counsel for a debtor are property of the estate. *See, e.g., In re Prud-*

*homme,* 43 F.3d 1000, 1003–04 (5th Cir.1995)(unearned portion of retainer is property of estate and court has equitable power to order disgorgement even of earned attorneys' fees); *In re Independent Engineering Co., Inc.,* 232 B.R. 529, 533 (1st Cir. BAP 1999)(retainer paid by third party to debtors' attorney was property of debtors' estate); *In re Tundra Corp.,* 243 B.R. 575, 582–83 (Bankr.D.Mass.2000).

The Debtors assert that they all have an interest in the escrow funds which were paid to counsel on all their behalf. We agree. The retainers were paid on behalf of all the Debtors and, therefore, all the Debtors have an interest in those funds. It is not relevant who paid the retainer, so long as the retainer is meant to cover the fees of the attorneys for all the Debtors, as it clearly was in these cases. *See, e.g., Independent Engineering,* 232 B.R. at 533. Thus, we conclude that the Debtors do have sufficient property in the United States to make them eligible to file bankruptcy petitions under section 109 of the Bankruptcy Code. Arabella's motion to dismiss is denied.

### B. Confirmation

Several objections to confirmation were interposed by Arabella.

### 1. No Impaired Class Has Accepted the Plan

Under the original Plan, the Noteholders were the only class impaired and entitled to vote. When that class rejected the Plan, the Debtors modified the Plan on May 16, 2000, purporting to impair the claim of Credit Lyonnais. Credit Lyonnais then submitted a ballot (dated May 3, 2000) purporting to accept the Modified Plan. (Exhibit D–9.)[7] The Debtors, therefore, assert they have the minimal one

---

6. There was no evidence presented as to the source of the funds deposited into the Delaware account.

7. There is no evidence regarding when this ballot was received, nor is it even clear that it relates to the Modified Plan, which was not filed until 13 days after the date of the ballot.

impaired accepting class required by section 1129(a)(10).

Arabella disputes this contention for several reasons. First, the Credit Lyonnais ballot cannot be counted as it was received after the deadline fixed by the Court for voting on the Plan. Second, the Credit Lyonnais claim is not impaired by the Modified Plan because its treatment is actually enhanced by the changed terms. Third, even if it is impaired, the impairment has been manufactured solely for the purpose of gerrymandering the Plan voting.

### a. *Timeliness of the Ballot*

■ In the Order approving the Disclosure Statement dated March 24, 2000, the Court set April 28, 2000, as the deadline for voting on the Debtors' Plan. The Credit Lyonnais ballot is dated May 3, 2000.

Several courts have held that a late ballot cannot be counted unless the Court, on Motion and after finding excusable neglect, extends the time for voting. *See, e.g., Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1314 (8th Cir.1987); *In re Richard Buick, Inc.,* 126 B.R. 840, 847–48 (Bankr.E.D.Pa.1991). Other courts, however, have been liberal in allowing late ballots. *See, e.g., In re Rhead,* 179 B.R. 169, 177 (Bankr.D.Ariz.1995)(deeming modified plan and oral argument of counsel to be the required motion to extend voting deadline and counting late ballot). Since Credit Lyonnais was not afforded an opportunity to vote on the original Plan, if the Modified Plan does impair its claim, an extension of time to permit it to vote on the Modified Plan is warranted.

### b. *Impairment of the Claim*

■ Arabella insists that the Credit Lyonnais claim is not impaired by the Modified Plan because the treatment of that claim is more onerous to the Debtors than simply reinstating the loan. Under the Modified Plan, the Debtors must (1) pay a higher interest rate to Credit Lyonnais, (2) maintain a higher value of collateral securing its loans (130% instead of 120% of the loan balance), and (3) repay the loan principal balance faster (by paying an extra $3 million by September 30, 2000, and an extra $500,000 semi-annually). (*Compare* Exhibit A–22 *with* Modified Plan at Exhibit A.) In addition, the Debtors must obtain the guarantee of the Credit Lyonnais debt by Captain Tsakos. (*Id.*)

The Debtors assert that it is irrelevant whether Credit Lyonnais' position is improved or not; they assert that *any* change is impairment. *See, e.g., In re L & J Anaheim Assoc.,* 995 F.2d 940 (9th Cir. 1993); *Rhead,* 179 B.R. at 177 ("any change of a creditor's rights, whether for the better or for the worse, constitutes impairment and creates the possibility of a 'consenting impaired class'."). Despite their articulation of such a seemingly extreme position, however, both *Rhead* and *L & J Anaheim* dealt with adverse changes to the affected creditor's rights. In *L & J Anaheim,* the creditor lost its right to foreclose in the event of a default, 995 F.2d at 943, and in *Rhead,* the tax lienor was to be paid over three years, 179 B.R. at 176.

We are not required to decide whether improvement in a creditor's legal or contractual rights under a plan constitutes impairment, however, because we readily conclude that Credit Lyonnais' rights are negatively impacted by the Modified Plan. Arabella overlooks the significant impairment of one of Credit Lyonnais' greatest rights, its interest in the restricted cash account. (Exhibit A–22 at § 9.2(a).) Under the Modified Plan, the Debtors are given immediate access to the restricted account (which currently totals over $5.6 million) to make payments to other creditors under the Plan and for operating capital. (Modified Plan at Exhibit A, p. 2; Exhibit D–2.)

Unfettered use of a secured creditor's restricted cash is clearly impairment of that creditor's rights. *See, e.g., In re Dwellco I Limited Partnership,* 219 B.R. 5

(Bankr.D.Conn.1998)(secured creditor was impaired under plan it proposed because plan provided for use of creditor's cash collateral to pay administrative, priority and unsecured creditors' claims).

Further, if the Debtors do not meet the collateral value requirements of the Modified Plan, it is not a default of the Credit Lyonnais facility, rather the amount of interest due just increases. (*Id.* at pp. 2, 4 and 9.) Such a change of Credit Lyonnais' rights clearly constitutes impairment. *See, e.g., L & J Anaheim,* 995 F.2d at 943 (removal of creditor's ability to foreclose on event of default constitutes impairment).

▇ Arabella argues that the Modified Plan treatment is no different from one of the alternative treatments in the original Plan, under which the Debtors claimed that Credit Lyonnais was not impaired. Arabella asserts, therefore, that the Debtors are judicially estopped from now arguing that Credit Lyonnais is impaired.

There is one significant difference, however. Under the prior Plan, Credit Lyonnais had the option of rejecting the Aida refinance and leaving its rights unimpaired. Thus, the Debtors are not judicially estopped from asserting that the Modified Plan does impair Credit Lyonnais because it does not give Credit Lyonnais the option of leaving its rights unaffected.

### c. *Artificial Impairment*

▇ Arabella asserts, however, that because the Debtors have blatantly impaired Credit Lyonnais only for the purpose of obtaining the vote of an impaired class, the impairment should somehow be ignored. It cites to several cases which have condemned such "gerrymandering" of classes for voting purposes. *See, e.g., In re Willows Convalescent Centers, L.P.,* 151 B.R. 220, 222 (D.Minn.1991)("debtor may not manufacture impaired classes merely for the purpose of garnering votes of such classes in favor of its plan") and cases cited therein. Specifically, courts have condemned modifications which improve or only slightly impair a creditor's position for no justifiable reason as being "artificial" impairment, or a mere artifice. *See, e.g., In re Windsor on the River Associates, Ltd.,* 7 F.3d 127, 131 (8th Cir.1993); *In re W.C. Peeler Co., Inc.,* 182 B.R. 435, 437 (Bankr.D.S.C.1995); *In re Dean,* 166 B.R. 949, 954 (Bankr.D.N.M.1994); *In re Meadow Glen, Ltd.,* 87 B.R. 421, 427 (Bankr.W.D.Tex.1988).

In *In re Daly,* 167 B.R. 734 (Bankr. D.Mass.1994), the Court concluded that the debtor could not make a last minute amendment to a plan, solely to create an impaired accepting class. In that case, the Court found that:

> [T]he impairment of Rattey's claim in the most recent plan was plainly contrived and engineered solely to create an accepting impaired class. In earlier versions of the plan, Rattey's claim was *greater* than in the present plan but not impaired. The *timing* of the amendment is telling: the plan was amended to impair Rattey's claim only when it became clear to the Debtor that he could not rely on North Attleboro's priority tax claim to satisfy the requirement of an accepting impaired class. The *extent* of the impairment is also relevant. The impairment of Rattey's claim, though real, pales in comparison to the impairment of the unsecured claims....
>
> Thus the impairment of Rattey's claim has no reasonable basis other than the need to create an accepting impaired class. The cases are clear that this is impermissible. A Debtor may not satisfy § 1129(a)(10) by manufacturing an impaired class for the sole purpose of satisfying § 1129(a)(10) and thereby forcing the plan upon a truly impaired class that has voted to reject the plan....*This contrived and artificial impairment* can be viewed either as a violation of the requirement of an accepting impaired class, § 1129(a)(10), or as a violation of the requirement that the plan be proposed in good faith,

§ 1129(a)(3), or as both. Whichever way it is viewed, it prevents confirmation of the plan.

167 B.R. at 736–37 (emphasis added) (citations omitted).

While similar to *Daly,* we conclude that the facts of this case are sufficiently different to distinguish it. As noted above, there is a real impairment of the rights of Credit Lyonnais (relinquishing its right to hold onto the restricted cash and its foreclosure remedies); it is not illusory or artificial. Further, the impairment is substantial, affecting over $5.6 million in cash collateral (more than 10% of its outstanding loan balance). In addition, the Debtors have a reasonable basis for the impairment: the funds are necessary to meet the distribution requirements of the Modified Plan. While the timing does suggest that the modified treatment was proposed in order to meet the requirements of section 1129(a)(10), we are loathe to adopt a rule which chills the ability of a debtor to make last minute deals with creditors in order to achieve a consensual plan or otherwise reduce opposition to the plan.[8]

Thus, we conclude that Credit Lyonnais is impaired by the Modified Plan and entitled to vote.

### 2. *Releases*

■ Arabella objected to certain release language contained in the Modified Plan. (Modified Plan at Article X.) That section provided for the release of the Debtors' directors and officers and of the Ad Hoc Committee of Noteholders by the Debtors. (*Id.* at Article X B.) In addition, any creditor who (i) accepted the Plan, (ii) was in a class which accepted or is deemed to have accepted the Plan, or (iii) is entitled to receive a distribution under the Plan shall be deemed to have released the Ad Hoc Committee of Noteholders and their representatives from any claims arising from their actions in connection with negotiating the Plan. (*Id.* at Article X C.) Finally, the Modified Plan provided that the Debtors, Reorganized Debtors, the officers and directors of the Debtors, the Indenture Trustee under the Notes, the Ad Hoc Committee of Noteholders and their respective professional advisors would have no liability to anyone for their actions in connection with formulating the Plan, except for gross negligence or wilful misconduct. (*Id.* at Article X E.)[9]

At the confirmation hearing the Debtors offered a proposed Confirmation Order which revised the Modified Plan to delete Article X C and delete any release in Article X E of any third party (thereby providing only for the discharge of the Debtors). This leaves only the release by the Debtors of their officers and directors and the Ad Hoc Committee of Noteholders. (*Id.* at Article X B.)

Arabella argues that this language is still violative of the Code. *See, e.g., In re Continental Airlines,* 203 F.3d 203 (3d Cir. 2000). The Debtors have offered no evidence to support even the Debtors' release of any claims they (or any party acting derivatively through them) may have against their officers and directors or the Ad Hoc Committee of Noteholders. *Id.* at 214 (reversing order confirming plan of reorganization which contained releases of third party actions against directors and

---

8. Many of the courts which condemn artificial impairment are also confronting classification issues; that is, with no legitimate justification, the debtor has created a separate claim of favored creditors which are only slightly impaired to assure the class votes to accept the plan. *See, e.g., Windsor on the River,* 7 F.3d at 131. That issue is not raised here since Credit Lyonnais, as a secured creditor, is entitled to a separate class. *See, e.g., In re Commercial Western Finance Corp.,* 761 F.2d 1329, 1338 (9th Cir.1985)(secured creditors are en-

titled to be separately classified because their collateral is different).

9. The Amended Plan originally also provided for releases of the Debtors' directors and officers by all creditors entitled to receive a distribution under the Plan (as well as creditors who accepted, or those whose class accepted, the Plan). That language was deleted in the Modified Plan.

officers because record was devoid of evidence to support them). *Cf. In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D.Del.1999), *citing Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930 (Bankr.W.D.Mo.1994)(evidence presented that releasees had made substantial contribution to the plan, the releases were necessary since the releasees were continuing to serve the reorganized debtor, affected parties had voted overwhelmingly in support of the plan and the plan provided for a significant distribution to creditors).

On this record, the Debtors have not met their burden of establishing that the revised releases are appropriate, because of the failure of the affected class (the Noteholders) to support the Modified Plan. We conclude that the "overwhelming support" factor articulated in *Master Mortgage* requires that the affected class accept the plan by at least the percentages required by section 1126 of the Bankruptcy Code.

3. *Best Interests of Creditors*

 Arabella asserts that the Modified Plan fails to meet the requirements of section 1129(a)(7) that impaired creditors receive at least as much as they would if the Debtors were liquidated under chapter 7. Under the Modified Plan, the Noteholders are to receive 50% of their claims in cash on the Effective Date.[10] (Modified Plan at Article III B 4.) According to the Debtors' analysis, if they were liquidated under chapter 7, the Noteholders would receive only approximately 30% of their claims. (Disclosure Statement at Exhibit D.)

The Debtors presented testimony by two experts that in their opinion the Debtors' vessels had a total value of $96.7 million without charters and $104.7 million with charters. (Exhibits D–1, D–8.) On cross examination, Arabella sought to discredit that testimony and did an effective job. Both experts admitted that charter rates and vessel values have been increasing over the past year, at an accelerated pace. (Exhibit A–1.) They admitted that the industry had suffered a five year low in the summer of 1999 and that it was recovering. They admitted that the recovery was expected to continue but could not say for how long or if it would reach prior highs.

The Debtors' experts also acknowledged that the Debtors' charter hire agreements were generally at or above market value.[11] Although the Debtors assert that the charter hires are not assignable, and therefore must be ignored in determining the value of the vessels, Arabella disagrees.[12] It is not necessary for us to resolve this issue, because we do not believe that this factor is significant. Since the Debtors' charter hires are of short duration, and market rates are going up, the lack of a long term charter agreement in place may in fact enhance the value of the vessels (allowing a buyer to recharter at higher prices or use the vessel itself). The Debtors' ex-

10. In addition, interest will be paid from May 1, 2000, until the Effective Date occurs.

11. For example, the Hanjin vessels are chartered at $20,000 per day while the current market rate is $16–17,000 per day. The Debtors' Panamax carrier expert testified that charter rates are now $10,000 compared to $6,000 a year ago and that the Debtors should have no problem finding charters for their Panamax vessels.

12. Arabella notes that the Debtors are assuming the contracts under the Modified Plan. (Modified Plan at p. 19.) Arabella asserts that if the agreements were not assignable under section 365, they could not even be assumed by the Debtors. *See, e.g., In re West Electronics, Inc.*, 852 F.2d 79 (3d Cir.1988) (holding that if contract is not assignable under applicable non-bankruptcy law, debtor cannot assume it under section 365). Thus, they assert that if the charters are assumable by the Debtors, they must be assignable. Further, they note that a chapter 7 trustee could avoid the entire problem of assignability of the charters by simply selling the stock of the vessel-owning subsidiaries. It is typical in this industry to have a separate subsidiary own only one vessel and sales of stock of such subsidiaries is not unusual. In fact, the Debtors acquired the Hanjin vessels in the same manner.

perts at least acknowledged that the short charter terms did not affect the vessels' value significantly.

Arabella's counsel also pointed to recent sales (and prices at which vessels are currently listed for sale) of vessels comparable to the Debtors' which the experts had not considered. (Exhibits A–7 & A–28.) Counsel also identified numerous appraisals that the Debtors had had done of their vessels as far back as April, 1999, which showed higher values for the vessels, at a time when market values were at a five-year low. (Exhibits A–25 & A–26; Disclosure Statement at Exhibit G.) The Debtors' container ship expert acknowledged that an additional year of depreciation did not account for the difference in value, especially given the rising values of vessels as the industry recovers. The fact that the Debtors had numerous appraisals showing significantly higher values for the vessels at a time when the industry was at an all time low seriously undermines the validity of its evidence of value today.

In fact, the Debtors' Panamax carrier expert's report shows that the Debtors' vessels are today worth $100,000 more than a month ago, $700,000 more than 6 months ago, and at least $2.7 million more than a year ago. He further acknowledged that he relied on comparable sales that are 2 to 4 months old and did not adjust his appraised values to reflect the rising market since those sales.

In addition, it was disclosed on cross examination that the Debtors' container ship expert relied on information given him by the Debtors which might not have been accurate, namely the speed and fuel efficiency of the vessels. For example, the maximum speeds which the expert assumed the vessels could achieve were less than the speeds which the Debtors had represented in their charter agreements for those same vessels. The expert admitted that even one knot in increased speed capability would increase the value of vessels of this size.

Arabella also questioned the values attributed to the vessels by the Debtors because of the terms of the exit financing arranged by the Debtors and the terms of the restructured Credit Lyonnais debt. The exit financing, secured by all vessels except the Hanjin vessels, is in the amount of $45 million and requires that the Debtors maintain an initial value to loan ratio of 125%. (Exhibit A–15.) Thus, Arabella asserts that the Debtors' non-Hanjin vessels must have a current value of least $56 million. Further, the exit financing assumes that the Debtors, within six months, will sell the Tiger Island and Tiger Bay for at least net $3 million (as opposed to the Debtors' appraised value of $2.4 million for those vessels). After that sale (and paydown of the exit financing to $42 million), the Debtors must maintain a value to loan ratio of 143% or $60 million. Thus, Arabella asserts the Debtors' non-Hanjin vessels must be worth at least $56 to $63 million or the lenders would not have committed to making the loan. In fact, the lenders were provided with an appraisal obtained by the Debtors in December, 1999, showing the non-Hanjin vessels to be worth $67 million. (Exhibit A–3.)

Similarly, the Credit Lyonnais loan of $48,875,000 (Exhibits D–2 & D–4) requires a value to loan ratio of 120% today and 130% by September 30, 2000. (Modified Plan at Exhibit A.) Therefore, to secure the Credit Lyonnais debt, the Hanjin vessels must be worth at least $58.65 to $59.63 million, or approximately $20 million per vessel. This is less than the current list price ($23 million) for sister ships built the same year and significantly less than the list price ($25 million) for comparable vessels, the Trade Maple and Trade Harvest. (Exhibit A–28.)

While we are cognizant that list prices are typically not indicative of market value, the Debtors' container ship expert used, as a comparable, the fact that the owners of the Trade Maple and Trade Harvest had received an offer of $20.9

million for each.[13] (Exhibit D–1.) On cross examination, it was revealed that that comparable "sale" had not occurred because the sellers rejected it. (Exhibit A–28.)

The Debtors' container ship expert also acknowledged the rising prices of vessels in this industry since 1999. (Exhibit D–1.) In fact, in an industry newsletter which he authors, he reported that the market was "robust." (Exhibit A–1.) This rising market is reflected in the fact that the Debtors' experts appraised the vessels at 5 to 14% higher in May/June, 2000, than the Debtors' estimate of value in its Disclosure Statement filed in March 2000. (Disclosure Statement at Exhibits D & G.)

While Arabella did not introduce expert testimony as to the value of the Debtors' vessels itself, it did bring into doubt the values attributed by the Debtors' experts. That, together with the loans being extended to the Debtors secured by those assets, convinces us that the vessels must have a higher value than the Debtors suggest.

Based on all the evidence presented, we conclude that the value of the Hanjin vessels is $60 million, or $20 million each. Similarly, we conclude that the other vessels must be worth at least $63 million which is the amount necessary to meet the covenants of the exit financing.[14]

In addition to the vessels, the Debtors own other assets with a value of at least $17 million ($15.4 million in cash and $1.7 million in insurance claims). (Exhibits D–2, A–35 to A–40.) Arabella asserts that the Debtors also have causes of action against Sovereign for avoidance of a fraudulent conveyance in the amount of approximately $3.6 million which was paid within the year prior to the bankruptcy filing. (Exhibit A–19.) However, testimony was adduced that that payment was an advance against the management agreement to assure that Sovereign, and Tsakos Shipping, had sufficient funds to pay the actual vessel expenses in case the creditors sought to foreclose or the company was required to file bankruptcy. Arabella also asserts that the fees paid to Sovereign are recoverable as fraudulent conveyances since it questions what services Sovereign actually performs for the Debtors for the $1.2 million fee paid to it each year. The Debtors presented testimony that Sovereign keeps the books and records of all of the Debtors and provides other accounting and administrative services. Based on the unrefuted evidence presented by the Debtors we are unable to attribute any value to those potential causes of action at this time.[15]

Arabella also contests the amount of liquidation expenses. The Debtors' analysis includes over $5.3 million for costs associated with taking the vessels out of charter, relocating, repairing and maintaining them until they could be sold. It also includes $1.2 million for repatriating the vessels' crews, which Arabella calculates is $4,600 per crew member, an expense that it asserts is high. We agree with Arabella that, since most of the vessels are under charter and earning revenues, it would make more sense for a chapter 7 trustee to sell the vessels (or the stock of the companies owning the vessels) in service. The Debtors' experts acknowledged that many sales are with charter. Further, while it is the policy of the United States Trustee in this District not to allow chapter 7 trustees to operate businesses, since the Debtors in this instance operate the vessels only through their contract with Sovereign and Tsakos Shipping (at a profit to the Debtors of approximately $2 million per month be-

13. Apparently, because there are so few container vessel sales (only 50 per year of a worldwide fleet of about 2500), the Debtors' container ship expert relied on information beyond reported sales. (Exhibit D–1.)

14. This figure is based on a value of $3 million for the Tiger Island and Tiger Bay and a value of the remaining vessels equal to 143% of the exit financing or $60 million.

15. This is, of course, without prejudice to any action that might be brought to recover such sums.

fore debt service), a chapter 7 trustee should be able to do the same with minimal exposure. (Disclosure Statement at Exhibit E.) Thus, we conclude that the liquidation expenses are exaggerated and that they will not exceed the normal liquidation. expenses which the Debtors estimate to be $650,000.

Based on our conclusion that the vessels have a total value of $123 million and the Debtors have other assets worth at least $17.1 million, their total assets exceed $140 million. After payment of Credit Lyonnais' secured claim ($51.4 million) and chapter 7 and 11 administrative expenses ($1.5 million), there is available $87 million for distribution to Noteholders. Thus, we conclude that the Noteholders would receive more on liquidation than the 50% distribution ($63 million) they are to receive under the Modified Plan.

■ The burden of establishing compliance with section 1129(a)(7) is on the proponent of the plan. *See, e.g., In re Trevarrow Lanes, Inc.,* 183 B.R. 475, 479 (Bankr. E.D.Mich.1995); *In re Zaleha,* 162 B.R. 309, 316 (Bankr.D.Idaho 1993); *In re Future Energy Corp.,* 83 B.R. 470, 489 (Bankr.S.D.Ohio 1988) We conclude that the Debtors have failed to meet their burden on this point.

### 4. *Feasibility*

Arabella also asserts that the Modified Plan is not feasible. Section 1129(a)(11) of the Bankruptcy Code requires that the plan proponent establish that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(1).

■ Arabella asserts that the Debtors have failed to establish that the Modified Plan is feasible because they have not finalized the exit financing or the terms of the Credit Lyonnais restructuring. The

Debtors admit that the exit financing is contingent on the lenders' agreement to the final documentation and that Credit Lyonnais, although it has accepted the Modified Plan, must also approve the terms of any documentation relating to its restructured debt. The Debtors also admit that the documentation is not yet complete for either. However, the Debtors presented testimony regarding the terms of both loans to which the parties have agreed in principle and their belief that the final documentation will be substantially similar to those terms. (Exhibit A–15; Modified Plan at Exhibit A.)

With respect to Arabella's assertion that the Plan is not feasible because there is not final documentation of the exit financing or the Credit Lyonnais loan, we reject that position. Both lenders have issued a commitment letter and/or agreed to term sheets which are detailed and contingent only upon final documentation, confirmation of the Modified Plan, and no materially adverse changes occurring. (*Id.*) These conditions are not unusual and certainly do not cause the financing to be speculative or uncertain.

■ What causes the Debtors a feasibility problem is their assertion about the value of their vessels. As noted in Part 3 above, if the Debtors are correct that the vessels have a value of only $96 to $104 million, so that they meet the best interests of creditors' test under section 1129(a)(7), then the Debtors either (1) will not have the collateral value. necessary to obtain the exit financing or restructure the Credit Lyonnais debt or (2) will be in immediate default of those facilities.

Specifically, Arabella argues that the Credit Lyonnais restructuring requires that the Debtors have collateral securing its position equal to 130% of the balance as of September 30, 2000 ($48.875 million) or $63.54 million. Based on the testimony of the Debtors' experts, the value of the Credit Lyonnais collateral (the Hanjin vessels) is only $45 to $51 million. Thus, by

September 30, 2000, the Debtors will have a shortfall of $12.5 to $18.5 million in collateral pledged to Credit Lyonnais.

The Debtors respond that the Credit Lyonnais restructuring does require that the Debtors have collateral in that amount, but that if the Debtors fail to have that level of collateral they will only be required to pay additional interest to Credit Lyonnais. (Modified Plan at Exhibit A, p. 4.) They will not have to post additional collateral, will not have to pay cash to Credit Lyonnais for any deficiency in the collateral base, and will not be in default of the Credit Lyonnais facility. The Debtors note that their projections show that they will have sufficient cash to pay the additional interest penalty if their collateral is not sufficient. (Exhibit D–4.) Thus, rather than require additional financial restructuring in September, the Debtors assert that they have proven that they are reasonably able to comply with the terms of the Modified Plan, which is all that is necessary for confirmation. *See, e.g., In re Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165–66 (5th Cir.1993) (debtor need not guarantee success, only a reasonable assurance of viability is required).

Arabella makes a similar argument with respect to the exit financing. The exit financing requires that the Debtors have collateral equal to 125% of the $45 million loan or $56.25 million. (Exhibit A–15 at p. 6.) If the Debtors' experts are correct, the collateral securing that loan (the non-Hanjin vessels) is worth only $51.7 to $53.7 million. Based on those collateral valuations, the Debtors will be in immediate default of the exit financing if the Modified Plan is confirmed. Further, the situation will only get worse. Under the exit financing, the Debtors must sell the Tiger Bay and Tiger Island within 6 months and pay the lender $3 million. (*Id.*) The Debtors assert those vessels are worth only $2.4 million for scrap metal. (Exhibit D–1.) Even if the Debtors are able to pay the shortfall from operating profits, they will still need a collateral base of 143% after

the sale of the Tiger Island and Tiger Bay or $60 million. (Exhibit A–15.) Unlike the Credit Lyonnais loan, there is no evidence that this covenant of the exit financing is waivable or curable in any other fashion than collateral value.

Thus, we must conclude that, if the Debtors are correct about the value of their vessels, their Modified Plan is not feasible. *See, e.g., In re Preferred Door Co., Inc.,* 990 F.2d 547, 549 (10th Cir. 1993)(plan was not feasible where debtor was unable to pay administrative claims on the effective date).

### 5. *Absolute Priority*

Arabella asserts that the Modified Plan also violates the absolute priority rule, embodied in section 1129(b)(2)(B), in three ways: First, the Debtors who are parents of the subsidiary Debtors are retaining their stock without payment in full of the creditors of the subsidiaries (including the Noteholders whose obligation was guaranteed by each of the non-Hanjin Debtors). Second, Sovereign, a current shareholder of Global Ocean, will continue to control three members of the Global Ocean board of directors. Thus, Arabella asserts that Sovereign is retaining something (the right to name directors of Global Ocean) on account of its equity interest. Finally, under the Modified Plan the stock of Global Ocean will be owned by Marmaron, a company owned by Maria Tsakos, the daughter of the current controlling shareholder of Global Ocean, Captain Tsakos.

The Debtors assert that the retention of stock by some Debtors in the other Debtors is not really significant given the Debtors' request for substantive consolidation. If the Debtors' estates are consolidated, all assets of all Debtors will be available for repayment of creditors and the retention of the corporate stock by some Debtors will not affect any rights of creditors. The Debtors assert, in fact, that the corporate structure is advantageous to the Noteholders and other creditors since it isolates potential tort and

catastrophic liabilities to one vessel-owning subsidiary. We agree with the Debtors' conclusion. If substantive consolidation is granted, for purposes of plan confirmation, all the assets of all Debtors will be considered for repayment of creditors. Thus, the retention of the corporate structure among the Debtors will not adversely affect any creditors and the only equity retention issue should be at the ultimate parent level for purposes of section 1129(b).

■ With respect to the right of Sovereign to name directors to the Board of Global Ocean, the Debtors argue that Sovereign has that right, not as a shareholder [16], but pursuant to its contract with the Debtors. (Exhibit A–9.) The corporate charter of Global Ocean provides that the manager of its vessels is entitled to name three directors of its board. Thus, the Debtors argue that Sovereign has that right because of the assumption of its Management Agreement by the Debtors (Modified Plan at p. 19), and not because of Sovereign's rights as a 7% shareholder. (Exhibit D–5.)

We agree with the Debtors' conclusion. The corporate charter of Global Ocean gives the fleet manager, whoever that may be, the right to appoint directors to the board. The assumption of the Management Agreement confirms that Sovereign will have that right. Thus, we conclude that Sovereign is not retaining this right as a shareholder.

■ With respect to the grant of the equity in Global Ocean to Marmaron, the Debtors assert that this does not violate the absolute priority rule because the equity is not being retained by any existing shareholder. Rather, the Debtors assert that the equity is being sold to a non-shareholder. The fact that the purchaser is a relative of the largest shareholder of Global Ocean is not relevant, the Debtors assert. As support for this position, they cite the case of *Beal Bank v. Waters Edge Limited Partnership*, 248 B.R. 668 (D.Mass.2000). In that case, the District Court upheld the decision of the Bankruptcy Court confirming a plan providing for the private sale of the debtor's equity to an insider, the son-in-law of the debtor's shareholder. 248 B.R. at 680. The Court concluded that the absolute priority rule did not prohibit a private sale of the equity in the debtor to anyone other than an existing shareholder. *Id.* The Court did note, however, that the absolute priority rule might prohibit such a sale if the buyer was acting merely as a straw party for a shareholder. *Id.* It further acknowledged that sales to insiders were subject to special scrutiny in bankruptcy cases. *Id. See also, In re Abbotts Dairies, Inc.*, 788 F.2d 143 (3d Cir.1986).

While Arabella asserts that Maria Tsakos is clearly just a straw party for her father and brother,[17] we do not find it necessary to decide this issue because we disagree with the conclusion of the *Beal Bank* Court. We believe that the Supreme Court decision in *Bank of America v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) cannot be read as narrowly as the *Beal Bank* Court suggests. In fact, among numerous predictions of plans which may avoid the result in *LaSalle*, we have found none to suggest that a plan which gives the equity to the largest

---

**16.** Sovereign is a small shareholder of Global Ocean, owning only about 300,000 of over 4 million shares outstanding. (Exhibit D–5.)

**17.** There is certainly evidence to support such a conclusion. Mr. Jolliffe was vague in his testimony regarding Maria Tsakos' financial condition and business acumen. In cross-examination of a representative of the exit lender, Mr. Crawley, Arabella established that the exit lender had insisted that the new owner of Global Ocean be the "Tsakos family" or a "Tsakos company," meaning related to Captain Tsakos. It is significant to note that, while Captain Tsakos will no longer be the controlling shareholder of Global Ocean, he is personally guaranteeing the Credit Lyonnais loan ($51 million) and over $18 million of the exit financing for the Debtors. (Exhibit A–15 at p. 6; Modified Plan at Exhibit A.)

shareholder's daughter can pass muster.[18] While a simple solution, we conclude that it is fundamentally flawed.

In the *LaSalle* decision, the Supreme Court concluded that the absolute priority rule was violated where the debtor's plan permitted only its shareholders to invest new capital to obtain all the equity in the company. The Court was particularly concerned by the fact that the debtor had retained the exclusive right to propose a plan, thereby precluding others (including the objecting creditor) from proposing a plan "selling" the equity to another. 526 U.S. at 456, 119 S.Ct. 1411. The Court stated: "Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection." *Id.* In *LaSalle*, the "opportunity" which the Supreme Court found was given to the existing shareholders was the *exclusive* right to bid on the equity in the debtor.

The situation in this case is not very different. Here, Captain Tsakos through his control of the Debtors, as the largest shareholder and part of the group controlling over 50% of the stock in Global Ocean, has retained his *exclusive* right, to *determine* who will be the owner of Global Ocean (as well as the price that she will

pay for the ownership). This control of Global Ocean is a right which he holds "on account of" his current position as a controlling shareholder of Global Ocean.

Thus, we conclude that the Debtors' Modified Plan violates the absolute priority rule by allowing the existing controlling shareholder to determine, without the benefit of a public auction or competing plans, who will own the equity of Global Ocean and how much they will pay for the privilege. To avoid this result the Debtors must subject the "exclusive opportunity" to determine who will own Global Ocean to the market place test.[19] *LaSalle*, 526 U.S. at 457, 119 S.Ct. 1411. This can be achieved by either terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity (or the right to designate who will own the equity) in the context of the Debtors' Plan. *Id.* at 458, 119 S.Ct. 1411 ("whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here.").

### C. Substantive Consolidation

■ Because it may be relevant to any future plans, we will address the issues raised by Arabella in opposition to the Debtors' Motion for substantive consolidation. Arabella asserts that the Motion should be denied for two reasons: first, notice was not provided to all Noteholders,

**18.** *See, generally*, George H. Singer, *Supreme Court Clarifies "New Value Exception" To Absolute Priority Rule—Or Does It?*, 18–AUG Am. Bankr.Inst. J. 1, 33 (1999)("It would appear that any new value plan filed during the period of exclusivity afforded by § 1121 will now be patently unconfirmable ... unless a mechanism is in place that allows for competing bids ..."), Bruce W. White & William L. Medford, *Conducting Equity Auctions Under LaSalle—The Fog Thickens*, 18–OCT Am. Bankr.Inst. J. 20, 20 (1999)("Perhaps future equity interest sales should modify the two-step auction offer—first to creditors and then to third parties—and simply treat the sale of equity interests as the sale of any property of the estate."), Alexander F. Watson, *Left For*

*Dead: The Supreme Court's Treatment Of The New Value Exception In Bank Of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*, 78 N.C. L.Rev. 1190, 1206 (2000)("Ensuring that the market is the mechanism that determines the value of the firm would help ... to maximize the property, as old shareholders would be forced to pay at least as high a price as anyone else would pay.").

**19.** Although Mr. Jolliffe asserted that he talked to another unrelated party about investing in the Debtors, we do not believe that this limited "shopping" of the Debtors is sufficient.

whose rights are substantively affected by the Motion, and second, substantive consolidation is not appropriate because it adversely affects the rights of the Noteholders.

Although we did grant the Debtors' request to limit notice of the substantive consolidation Motion, it was as the result of the telephone conference on discovery and scheduling issues. At that time only the issue of reducing the time to answer was addressed. Had Arabella been aware of the request to limit notice (thereby not providing notice to all Noteholders) and raised it with the Court, we would not have granted the Debtors' request for limited notice because we conclude that substantive consolidation would have an effect on the rights of the Noteholders. For example, currently only Global Ocean and the Hanjin Debtors are liable for the Credit Lyonnais debt. Substantive consolidation would make the non-Hanjin Debtors liable for the Credit Lyonnais debt (which currently totals approximately $51 million). According to the Debtors' expert, the Hanjin vessels do not have sufficient value to cover the Credit Lyonnais debt. Thus, any Motion to substantively consolidate these Debtors must be made on notice to those adversely affected by it, which includes the Noteholders.[20]

## IV. CONCLUSION

For the reasons given above, we deny confirmation of the Plan and substantive consolidation until appropriate notice can be given. We also deny Arabella's motion to dismiss these cases, concluding that the Debtors are eligible to file the instant cases under section 109 of the Bankruptcy Code.

20. This is especially appropriate since the Debtors' Disclosure Statement advised Noteholders that the Debtors were not seeking substantive consolidation of the estates.